# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ROBERT J. POUND and PRO PRODUCTS, INC.,** )<br>)<br>**Plaintiffs,** )<br>)<br>v. )<br>)<br>**AIROSOL COMPANY, INC., et al.,** )<br>)<br>**Defendants.** )<br>) | CIVIL ACTION<br><br>No. 02-2632-CM |

## MEMORANDUM AND ORDER

On December 18, 2002, plaintiff Robert J. Pound brought several claims against several defendants regarding the sale and distribution of Black Knight, a pesticide manufactured by defendant Airosol Company, Inc. ("Airosol"). In one such claim, plaintiff Pound brought suit against Airosol under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a)(1). On March 10, 2004, the court granted plaintiff Pound's Motion for Partial Summary Judgment against Airosol, among other defendants, finding that, as a matter of law, Airosol's sale and distribution of Black Knight violated emissions standards set forth by the Clean Air Act, 42 U.S.C. § 7401 *et seq*. On November 12, 2004, plaintiff Pro Products, Inc. joined in the lawsuit.

The remaining issues before the court are: (1) the amount of monetary penalty against Airosol for its Clean Air Act violations; and (2) whether further briefing is necessary on the issue of attorney fees and costs. On June 6, 2005, after holding a bench trial on this matter, the court took the case under advisement. The court is now prepared to issue its findings of fact and conclusions of law in accordance

with Fed. R. Civ. P. 52(a).  For the reasons set forth below, the court will not impose a monetary penalty against Airosol.  Furthermore, the court denies plaintiffs' request for attorney fees and costs.

## FINDINGS OF FACT

### Background - Plaintiffs

1. Plaintiff Robert J. Pound owned and operated an unincorporated business known as Pro Products.  In the 1980s, plaintiff Pound started developing Provent-a-Mite, a product designed to treat and eradicate ectoparasites such as mites on reptiles.  Plaintiff Pound patented Provent-a-Mite in September of 2000 and began marketing and selling it that same year.

2. Pro Products was incorporated on April 4, 2003.  Plaintiff Pound is the sole officer, director and employee of Pro Products, Inc.

### Background - Airosol

3. Up until at least March 10, 2004, Airosol Company, Inc. manufactured, marketed, distributed, and sold Black Knight, a pesticide registered under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") (EPA Reg. No. 901-82) for treatment of various household pests.

4. Black Knight is not registered or approved for use in the treatment of snake mites or other pests that affect reptiles or other cold-blooded animals or for direct use on animals. However, Airosol was aware that Black Knight was popular among reptile owners for the treatment of reptile mites.

5. Within the reptile community, Black Knight was a direct competitor of Provent-A-Mite.

### Clean Air Act Violations

6. Black Knight is an aerosol product that contains hydrochlorofluorocarbons ("HCFCs") 22 and 142b (monochlorodifluoromethane and monochlorodifluoroethane, respectively), both of which are Class II substances as defined by the Clean Air Act, 42 U.S.C. § 7671a(b).

7. The 1990 Amendments to the Clean Air Act included provisions to phase out the use of ozone-depleting substances. In part, the Clean Air Act provides that,"[e]ffective January 1, 1994, it shall be unlawful for any person to sell or distribute, or offer for sale or distribution, in interstate commerce-(A) any aerosol product or other pressurized dispenser which contains a Class II substance." 42 U.S.C. § 7671i(d)(1)(A); *see also* 40 C.F.R. § 82.64(d) (disallowing the distribution or sale of any product categorized as "nonessential," which is defined as an "aerosol product or other pressurized dispenser which contains a class II substance").

8. Class II substances are banned by the Clean Air Act unless a manufacturer has applied, prior to January 1, 1994, for an exception or exemption for reformulation as set forth by statute or regulation. 40 C.F.R. § 82.65(b), (c). The reformulation exemption allows for an additional period of time in which a nonessential product can be distributed or sold following the approval or denial of an application for product reformulation. *Id.*

9. Airosol alleges that it submitted a request, dated December 22, 1993, for an reformulation exemption for Black Knight. However, the EPA's FIFRA file on Black Knight has no record of such request.

10. After its alleged 1993 reformulation exemption request, Airosol contends that it made numerous phone calls to the EPA to inquire about the status of its request, but received no indication as to whether its request had been approved or denied.

11. Airosol sold Black Knight from January 1, 1994 through August 19, 2002 without any written acknowledgment from the EPA of the receipt of its application for a reformulation exemption. During this time period, however, Airosol did file a yearly Pesticide Report for Pesticide-Producing Establishments with the EPA and included Black Knight on its report.

12. By letter dated August 19, 2002, the EPA issued a Section 114, 42 U.S.C. § 7414(a)(1), request to Airosol requiring it to submit information regarding its manufacture, sale and distribution of aerosol products or other pressurized dispensers containing a Class I or Class II substance.

13. Airosol responded by letter dated September 6, 2002, stating that it had requested a reformulation exemption for Black Knight in December 1993 but that it had received no correspondence from EPA regarding that request.

14. Airosol contends that believed it had obtained a reformulation exemption necessary to continue the sale and manufacture of Black Knight.

15. On March 10, 2004, this court granted summary judgment for plaintiffs, finding:

> Examining all the inferences in favor of Airosol, the court finds that no reasonable jury could find that Airosol met its burden to properly file an application for reformulation by January 1, 1994. The court therefore concludes that, as a matter of law, Airosol's manufacture, sale, and distribution of Black Knight violated the Clean Air Act.

(Doc. 159 at 9).

16. After the court's March 10, 2004 Order, Airosol discontinued the manufacture and sale of Black Knight.

17. On March 4, 2005, this court denied plaintiff Pound's request for an injunction to

       enjoin Airosol from selling Black Knight because "plaintiff has failed to produce any evidence tending to show that defendants are still selling Black Knight." (Doc. 279).

18. Airosol sold, offered for sale or distributed Black Knight from at least October 4, 1996 through March 10, 2004, a period of 2,715 days.

19. In total, Airosol sold 64,017 twelve-ounce cans of Black Knight and 548 twelve-pound cylinders of Black Knight between October 4, 1996 and April 30, 2005.

20. The evidence presented at trial supports plaintiffs' estimation that Airosol's profits from Black Knight were at least $4.33 per can and $24.36 per cylinder. Therefore, Airosol's profits from the sale of Black Knight in violation of the Clean Air Act are estimated at $290,542.89 ([64,017 cans x $4.33 profit per can] + [548 cylinders x $24.36 profit per cylinder]). This number is overstated, however, because there is a five-year statute of limitations for the enforcement of civil penalties. 28 U.S.C. § 2462; *United States v. Walsh*, 8 F.3d 659, 662 (9th Cir. 1993) (applying § 2462 to the Clean Air Act). Plaintiffs brought the instant claim on December 18, 2002. Therefore, the court will only consider those profits incurred after December 18, 1997.

## Airosol's Financial Status

21. Airosol has not been a profitable company for at least the last eight fiscal years.

22. In response to Airosol's financial troubles, Airosol's lender recently reduced its credit line by $100,000. Airosol has no further collateral to utilize for obtaining additional credit.

23. In response to Airosol's financial troubles, Airosol's lender has increased the interest rate on its line of credit.

24. Due to its financial troubles, Airosol has decreased its workforce from approximately ninety employees to approximately thirty employees.

25. Airosol has no cash reserves.

26. Airosol's accounts payable are currently approximately $1,000,000, and 49% of its accounts payable accounts are past due.

27. Airosol currently owes more than $850,000 on its line of credit of $900,000.

28. Airosol has a loan in the amount of $249,000 on which it can only afford to make interest payments and no principal payments.

29. A Clean Air Act penalty greater than $20,000 would bankrupt Airosol.

## CONCLUSIONS OF LAW

### Clean Air Act Penalty[1]

The Clean Air Act does not provide for private causes of action. *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Assoc.*, 453 U.S. 1, 15-17 (1981). Instead, plaintiffs brought suit under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a)(1), which provides that "any person may commence a civil action on his own behalf - (1) against any person . . . who is alleged to have violated . . .

---

[1] Effective February 10, 1993, Airosol manufactured and sold a product, registered under EPA Registration No. 901-82, as three different labels: Black Knight, Aircraft Insecticide and Government Insecticide. Plaintiffs offered evidence at trial that Airosol sold or offered to sell Aircraft Insecticide and Government Insecticide after January 1, 1994. Plaintiffs argue that Airosol's Clean Air Act penalty should take into account Airosol's profits from the sale of these two products in addition to profits from the sale of Black Knight. This court's March 10, 2004 Order, however, held that Airosol's manufacture, sale, and distribution of Black Knight violated the Clean Air Act; it did not consider or find that Airosol's sale of Aircraft Insecticide and Government Insecticide violated the Clean Air Act. Accordingly, in deciding Airosol's penalty for its Clean Air Act violations, the court will only consider Airosol's profits with respect to Black Knight.

-6-

or to be in violation of (A) an emission standard or limitation under this chapter . . . ." Penalties awarded in Clean Air Act citizen suits are deposited in a special fund of the United States Treasury. *Id.* § 7604(g)(1).

The court's analysis is limited to the amount of Airosol's penalty for its Clean Air Act violations. In support of a $19,836,000 penalty, plaintiffs argue that Airosol profited from its Clean Air Act violations, resulting in significant but immeasurable harm to the environment. Airosol argues that its voluntary removal of Black Knight from the market is a fair penalty, and that a monetary penalty is not warranted because plaintiffs brought their private citizen suit for the self-interested purpose of removing Black Knight, Provent-a-Mite's competitor, from the market. Airosol also argues that it did not intentionally violate the Clean Air Act, and that plaintiffs' proposed penalty of nearly twenty million dollars would bankrupt the company.

The court begins its analysis with the purpose of the Clean Air Act, which is to:

> (1) to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;
>
> (2) to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution;
>
> (3) to provide technical and financial assistance to State and local governments in connection with the development and execution of their air pollution prevention and control programs; and
>
> (4) to encourage and assist the development and operation of regional air pollution prevention and control programs.

42 U.S.C. § 7401(b). In determining a penalty amount under the Clean Air Act, the court

> shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same

>      violation, the economic benefit of noncompliance, and the seriousness of the
>      violation.

42 U.S.C. § 7413(e)(1).

Airosol's maximum penalty by law is $27,500 per day for each violation on or after January 30, 1997.  42 U.S.C. §§ 7413(b) and 7604(a); 40 C.F.R. § 19.4.  By plaintiffs' calculations, Airosol's maximum penalty is $75,020,000 (2,728 days x $27,500 per day).  Notably, the court has discretion in awarding Clean Air Act penalties.  *Tull v. United States*, 481 U.S. 412, 413 (1987) ("Congress has an unquestioned right to fix civil penalties, and may delegate that right to trial judges, particularly where, as here, highly discretionary calculations that take into account multiple factors are necessary.").

The court finds that several § 7413(e)(1) factors work to mitigate Airosol's potential penalty.  First, a penalty greater than $20,000 would cause Airosol to become bankrupt.  Second, although the court found in its March 10, 2004 Order that Airosol violated the Clean Air Act, plaintiffs did not establish at trial that Airosol intentionally violated the Clean Air Act.  Third, Airosol has not been previously penalized for similar violations.  Fourth, Airosol will not continue to benefit from its violations, as it has voluntarily ceased manufacturing and selling Black Knight.

Fifth, the court does not believe that Airosol's Clean Air Act violations were a serious threat to the environment or the public.  Significantly, the parties did not offer, and the court is not aware of, a single measurable injury to the environment or the public caused by Airosol's manufacture and sale of Black Knight.  Although the EPA is aware of the instant litigation, the EPA has not cited Airosol or elected to intervene in this litigation.

In support of a substantial penalty, plaintiffs point to *United States of America v. Wal-Mart Stores, Inc., et al.*, a case before the United States District Court for the Western District of Missouri.

There, the EPA and Wal-Mart entered into a consent decree in which Wal-Mart agreed to pay a $400,000 penalty for its sale of products with Class I and Class II substances in violation of the Clean Air Act. *See* Case No. 04-0086-CV-W-SOW, Doc. 372, Ex. A. However, *Wal-Mart* is distinguishable from the instant case because (1) the EPA, not a private citizen, brought suit against Wal-Mart for its Clean Air Act violations; (2) the penalty was the result of a consent decree; (3) prior to entering into the consent decree, the EPA had previously cited Wal-Mart for at least three violations to the Clean Air Act; and (4) the record did not contain evidence that a $400,000 penalty would bankrupt Wal-Mart.

Finally, and most importantly, the court finds that plaintiffs brought the instant lawsuit for the purpose of removing one of their competitors from the market. Plaintiffs have not shown that they are genuinely concerned about the environment; rather, it appears to the court that an economic, not environmental, interest was the reason for the lawsuit. For this reason, as well as those discussed above, the court finds that a monetary penalty imposed upon Airosol will not substantially further the purpose of the Clean Air Act.

Plaintiffs request that the court enjoin Airosol from manufacturing, marketing or selling Black Knight. On March 4, 2005, however, this court denied plaintiff Pound's request for injunctive relief, holding that "plaintiff has failed to produce any evidence tending to show that defendants are still selling Black Knight." Plaintiffs did not introduce this evidence at trial or thereafter. As such, the court denies plaintiffs' request for injunctive relief. The continued ban on the manufacture and sale of Black Knight is a sufficient economic penalty.

**Attorney Fees and Costs**

-9-

Plaintiffs also request further briefing on the issue of attorney fees and costs. The Clean Air Act's fee-shifting provision allows the court to award costs of litigation, including attorney fees, "whenever the court determines such award is appropriate." 42 U.S.C. § 7604(d). In its March 4, 2005 Order, this court considered this issue, and specifically discussed a circuit split regarding whether an award of attorney fees is appropriate when the prevailing party brought the suit for personal financial gain rather than to further the purpose of the Clean Air Act. Because the Tenth Circuit was silent on the issue, this court declined to award attorney fees to plaintiffs in its March 4, 2005 Order. To date, the Tenth Circuit has yet to decide the issue. Accordingly, the court defers to its previous ruling and denies plaintiffs' request for attorney fees and costs. Further briefing on this issue is unnecessary.

**IT IS THEREFORE ORDERED** that the court will not impose a monetary penalty against Airosol for its violations of the Clean Air Act.

**IT IS FURTHER ORDERED** that plaintiffs' request for attorney fees and costs is denied.

Dated this 18th day of July 2006, at Kansas City, Kansas.

  s/ Carlos Murguia
  **CARLOS MURGUIA**
  **United States District Judge**